UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,     )
                              )
        Plaintiff,            )
                              )
v.                            )     No.:   3:09-CR-93
                              )            (VARLAN/SHIRLEY)
DENNIS R. BOLZE,              )
                              )
        Defendant.            )

## MEMORANDUM AND ORDER

This criminal case is before the Court on the objections of defendant, Dennis R. Bolze,

to the Presentence Investigation Report (the "PSR") in this case prepared by the U.S.

Probation Office. The United States has responded to defendant's objections [Doc. 69]. On

May 19, 2010, the Court held an evidentiary hearing regarding defendant's objections to the

PSR at which Assistant U. S. Attorney Francis M. Hamilton appeared on behalf of the

government and Attorney Kim A. Tollison represented defendant, who was also present. The

parties presented evidence, testimony, and argument regarding the pending objections. The

Court also heard victim impact statements. At the conclusion of the hearing, counsel for

defendant requested leave to file a post-hearing brief on defendant's objections. The Court

granted the request. On June 10, 2010, defendant filed a post-hearing brief [Doc. 85], and

on July 7, 2010, the government filed a response [Doc. 88] to defendant's post-hearing brief.

The Court has carefully considered each of defendant's objections to the PSR, the government's response, and the parties' post-hearing briefs [Docs. 85, 88], as well as the arguments, testimony, and evidence presented at the May 19, 2010 evidentiary hearing [Doc. 83],[1] all in light of the applicable law. The Court now explains its rulings on each of defendant's objections.

## I. Background of the Case[2]

On July 21, 2009, defendant was charged in a six-count indictment with three counts of wire fraud, in violation of 18 U.S.C. § 1343, and three counts of money laundering, in violation of 18 U.S.C. § 1957 [Doc. 23]. These charges arose out of the government's allegations that defendant engaged in conduct constituting a Ponzi scheme which involved numerous individuals in both the United States and Europe and lasted from about April 2002, through about December 2008, a little more than six and a half years.

On November 10, 2009, pursuant to a plea agreement, defendant pled guilty to all six counts in the indictment [Doc. 43]. According to the plea agreement, defendant owned, operated, and controlled all the activities of two corporations, Centurion Asset Management, Inc. ("CAM") and Advanced Trading Services, Inc. ("ATS"). Defendant used these corporations to perpetrate a scheme to defraud numerous individuals who invested funds with him, CAM, and ATS. As part of the scheme, defendant fraudulently represented to

[1] Document number 83 contains the transcript of the evidentiary hearing, held on May 19, 2010.

[2] These facts are taken from the facts stipulated to and agreed to in the plea agreement [Doc. 43, pp. 3-13].

prospective investors that he would invest all the funds they entrusted to him in CAM's and ATS's day-trading of futures contracts. Defendant carried out his scheme by soliciting millions of dollars of funds under false pretenses. Rather than investing these funds in futures contracts as promised, defendant diverted the funds of new investors to existing investors and misappropriated and converted other funds to his own benefit without the knowledge or authorization of the investors. To conceal and maintain his Ponzi scheme, defendant fabricated "Trader's Invoices," documents which fraudulently represented to investors that defendant and the corporations he controlled had generated profitable returns on their investments. Defendant also created and posted a web-page, www.accesscam.net, which contained fabricated day-trading results for the purpose of fraudulently representing to investors that he had generated returns on their investments.

Over the course of the Ponzi scheme, defendant received a total of $21,584,189.13 from investors, but invested only $1,601,188.00 on their behalf. Out of $21,584,189.13, the total defendant received, defendant used $9,626,620.64 to pay existing investors to make them believe that their investments with him were both safe and generating a profitable return. In the plea agreement, defendant agreed that the actual loss for his offenses was $12,890,602.75.

Following defendant's plea of guilty, the probation officer prepared a PSR in accordance with the Federal Sentencing Guidelines (the "guidelines"). The PSR calculates defendant's total offense level as 39 and his criminal history category as III, resulting in an advisory guideline range of 324 to 405 months imprisonment. Defendant filed objections to the PSR, along with a sentencing memorandum and a request for a sentence below the advisory guideline range [Docs. 65, 84].[3] The government filed a motion for acceptance of responsibility pursuant to § 3E1.1(b), requesting that the Court award defendant a one-level reduction in his total offense level for acceptance of responsibility [Doc. 63], and a response to defendant's sentencing memorandum and request for below-guidelines sentence, along with supporting exhibits. In these filings, the government requested that the Court impose a sentence of 405 months imprisonment, a sentence at the upper end of the guideline range [Doc. 69].[4] The government's response also contains its response to defendant's objections to the PSR and notes that, pursuant to the plea agreement, the government has reserved its right to oppose any reduction in defendant's total offense level for acceptance of responsibility "should the defendant engage in any other conduct or make statements that are

---

[3] Defendant requested that his sentencing memorandum and request for a below guideline sentence be filed under seal [Doc. 64]. The Court denied defendant's request to seal the filing in its entirety, but permitted defendant to redact sensitive personal information pertaining to defendant's family members [Doc. 73].

[4] The government requested leave to file, under seal, certain exhibits to its response on grounds that the exhibits contained personal identifying information [Docs. 70, 77]. The Court granted these requests [Docs. 72, 79].

inconsistent with accepting responsibility for the defendant's offenses." [Doc. 69, pp. 26-27; Doc. 43, p. 14].

Defendant filed a motion to bifurcate the sentencing hearing [Doc. 66] into two hearings–an evidentiary hearing to address defendant's objections to the PSR, followed by a ruling from the Court on defendant's objections, and a sentencing hearing at which the sentence will be imposed. The Court granted the motion [Doc. 75]. The evidentiary hearing on defendant's objections was held on May 19, 2010, with the parties presenting argument, evidence, testimony, and victim impact statements [Doc. 83]. The parties filed briefs following the hearing [Docs. 85, 88].

## II.      Analysis

Defendant's objections pertain to the PSR's determination that several of the guidelines' special offense characteristics enhance defendant's total offense level.[5] Defendant argues that these enhancements should not apply to his offense conduct. The government maintains that the enhancements do apply and serve to increase defendant's total offense level. The government also maintains, in its post-hearing brief, that defendant's testimony at the evidentiary hearing was inconsistent with accepting responsibility for his offenses and thus, pursuant to the terms of the plea agreement, defendant is not entitled to any reduction in his total offense level.

---

[5] Defendant has not objected to the PSR's determination of his criminal history category.

## A.    Defendant's Objections to the PSR

Federal Rule of Criminal Procedure 32(i)(3)(B) provides that at sentencing, the court, "must–for any disputed portion of the presentence report or other controverted matter–rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing[.]" Fed. R. Crim. P. 32(i)(3)(B).  Section § 6A1.3 of the guidelines, pertaining to the resolution of disputed factors in sentencings, offers some guidance:

> When any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor.  In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.

U.S.S.G. § 6A1.3; *see also* Fed. R. Evid. 1101(d)(3).  Thus, in determining whether there is sufficient evidence to apply a relevant but disputed sentencing factor (such as a special offense characteristic), a court may rely on evidence that might be inadmissible in another procedural setting–evidence such as victim impact statements, documents, and the summary testimony of law enforcement agents.  *See, e.g., United States v. Clark*, 335 F. App'x 181, 184 (3rd Cir. 2009) (stating that victim impact statements are admissible in a sentencing proceeding); *United States v. Salazar*, 8 F. App'x 297, 301-02 (upholding admission of hearsay documents during a sentencing proceeding to support the guideline enhancement for obstruction of justice); *United States v. Gibson*, 985 F.2d 860, 865 (6th Cir. 1993)

(discussing information the court obtains through PSRs and law enforcement sources and stating how the admission of this information at sentencing does not violate the defendant's right to confront the witnesses against him). In addition, factors relevant to sentencing must only be proved by a preponderance of the evidence. *United States v. Stout*, 599 F.3d 549, 558 (6th Cir. 2010); *see also United States v. Greene*, 71 F. 3d 232, 235 (6th Cir. 1995).

In accordance with this authority, and after a thorough review of defendant's objections, the government's response, the supporting exhibits, the hearing testimony, and the relevant law, the Court now explains its rulings.

### 1.     Enhancement for Sophisticated Means, § 2B1.1(b)(9)(C), PSR ¶ 62

Defendant objects to the PSR's application of § 2B1.1(b)(9)(C) [PSR, ¶ 62], which provides for a two-level enhancement if a defendant's offense involved "sophisticated means." U.S.S.G. § 2B1.1(b)(9)(C). The commentary to this section defines "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. . . . Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." *Id.* cmt. app. n.8(B).

Defendant asserts that the term "sophisticated means" must be considered in the context of the specific offense in this case–a Ponzi scheme. He argues that a Ponzi scheme, by its very nature, requires some effort and more than minimal conduct and that, when considered in the context of other Ponzi schemes, the facts and circumstances surrounding this Ponzi scheme do not involve "sophisticated means."

As support, defendant argues that the evidence relied upon by the government does not indicate sophisticated conduct or any that was especially intricate or complex. Defendant argues that the government's Exhibit 3 ["Exhibit 3," Doc. 69-3, pp. 2, 3-4], which contains a promotional flyer and an informational brochure and was distributed to defendant's European investors by Denys Dobbie ("Dobbie"),[6] are not sophisticated because the documents only describe what is commonly done by individuals who use computers or software programs in their personal and professional lives. Defendant argues that the information and phrases contained in the brochure are the everyday phrases and tools investors use to manage investment portfolios and that there is nothing described in the brochure that is different or more sophisticated than what investment firms like Charles Schwab, eTrade, Scottrade, or Fidelity Investments do on a day-to-day basis. Defendant points to "Internet Encryption Technology" and "Direct Connections to Exchange and Clearing," phrases used in the brochure and mentioned in the government's response brief, and asserts that these are just "fancy title[s] on the basic things one has to do in order to invest and allow investors to keep track of their account." [Doc. 85, pp. 9-10].

Defendant also argues that Exhibit 6 ["Exhibit 6," Doc. 69-5, pp. 3, 4-6, 7-10, 15, 31-34], a collective exhibit submitted by the government which contains documents relating to

_____

[6] At the evidentiary hearing, defendant testified that Dobbie, now deceased, was a retired hedge fund manager who got defendant interested in "running a hedge fund, [and] different things like that." [Doc. 83, p. 84]. Defendant also stated that Dobbie was his first investor and it was Dobbie who solicited and brought in European investors and who wanted a brochure for these potential overseas investors [*Id.*, pp. 84-85, 99-100]. Defendant also testified that Dobbie was in control of the European investors [*id.*, p. 113], and that they called Dobbie whenever they had questions about their investments [*Id.*, p. 100].

one investor's account with defendant, does not indicate sophisticated or complex conduct because all the documents are simple, straightforward, and reflect the steps used by "[e]very investment firm in existence today[.]" [Doc. 85, p. 11]. Defendant asserts that all Exhibit 6 shows is the "basic steps one has to go through to open an [investment] account, fund that account, and keep track of that account[]" [*Id.*, p. 10], and that all Exhibit 6 reflects is the basic conduct one must do to operate a Ponzi scheme.

Defendant also argues that Exhibit 11 ["Exhibit 11," Doc. 69-6, pp. 50-52], an exhibit submitted by the government which contains photographs of the wall of flat screen monitors at defendant's Gatlinburg home, does not support the sophisticated means enhancement because computers and monitors are a necessary part of any online investing. Defendant asserts that the monitors shown in the photographs were not used as "props" in defendant's "trading room," but were used for other things.

After reviewing the government's exhibits, defendant's offense conduct as stipulated in the plea agreement, and after considering the arguments and evidence offered at the hearing, the Court finds that the sophisticated means enhancement does indeed apply to defendant's conduct. While the Court agrees with defendant that defendant's offense conduct should be considered on terms of what it is—a Ponzi scheme—the Court does not agree that defendant's conduct was a simple scheme lacking in sophistication.

The U.S. Court of Appeals for the Sixth Circuit has noted, that in applying an enhancement for sophisticated means, a district court may rely on the whole of the defendant's offense conduct because the enhancement can be based on conduct "which is on

the whole sophisticated, even though the individual aspects of the conduct are not sophisticated." *United States v. Cox*, 357 F. App'x 629, 634, (6th Cir. Dec. 16, 2009).  In *Cox*, the Sixth Circuit affirmed the district court's application of the sophisticated means enhancement because it found that while the defendant's individual actions lacked sophistication, when viewed as a whole, his actions constituted sophisticated means, "especially in light of the fact that [the defendant] actually created several entities to hold the money during the relevant time period."  *Cox*, 357 F. App'x at 634.[7]

In *United States v. Erwin*, 67 F. App'x 876 (6th Cir. Jun. 12, 2003), another case in which the Sixth Circuit upheld the district court's application of the sophisticated means enhancement, the PSR determined that the defendant's conduct included the alteration of account statements and 1099 forms, the deception of his clients (including his accountant) for several years, the defendant's defrauding of his investors of more than $2.5 million, tracking what the victims' accounts would have been if he had not withdrawn the funds, and estimating the interest the investors would have earned on the withdrawn funds.  *Erwin*, 68 F. App'x at 881.  Furthermore, the district court used the following facts to conclude that the defendant's methods were sophisticated enough to warrant the two-level enhancement:

> The Court believes that the government has shown by at least a preponderance of the evidence that the offense conduct . . . was

_____

[7] The Sixth Circuit in *Cox* noted that the defendant was not "an especially sophisticated investor; his name, address, and social security number were tied to each account and his individual actions lacked sophistication.  He invested funds with individuals who turned out to be thieves, and then withdrew the remaining investments and placed them in an E-Trade account.  Finally, once his actions with the investor money began to unravel he simply disappeared, only to return willingly four years later."  *Cox*, 357 F. App'x at 634.

especially complex and intricate . . . [the defendant] had to constantly monitor those account statements and perform sophisticated calculations in order to render falsified accounts to his clients . . . calculating hypothetical balances . . . calculating dividends and interest on funds that no longer existed . . . preparation of additional false documents . . . false income tax forms[.]

*Id.* at 881.

In this case, defendant's offense conduct, when viewed as a whole, is similar to the conduct of the defendants in *Cox* and *Erwin*, if not more sophisticated and longer lasting. According to the plea agreement and the evidence submitted by the government, defendant concealed his scheme for over six and a half years and the actual loss from his offense is at least $12,890,602.75 [Doc. 43, p. 11]. Defendant also owned and operated two corporations, CAM and ATS, which he used to perpetuate and conceal his scheme. In addition, defendant created an elaborate method of wooing potential investors, including producing promotional flyers, brochures, a website, applications for investment accounts, Traders' Invoices, and contracts for services. Further, in perpetuating and concealing the Ponzi scheme, defendant maintained account balances for each investor and created numbers and figures to reflect positive growth in the numerous individual accounts. While the actual creation of these documents and this website may not have been extremely sophisticated (a website with few bells and whistles and documents created using Microsoft Word and containing terms used in common investor parlance), the manner in which defendant executed and coordinated his scheme indicates to the Court an "especially intricate offense."

Defendant argues that the brochures, investment applications, programs, and the steps investors took to view and track their accounts were essentially the same as those engaged in by legitimate investment firms and required of investors in legitimate enterprises. While defendant argues that this implies that his offense conduct was not sophisticated, the Court disagrees. On the contrary, the Court finds this conduct to be one of the primary indicators of the sophistication of defendant's Ponzi scheme. Coordinating an extensive, fraudulent investment scheme, making it work for six and a half years, and taking in the amount of money defendant's scheme involved, while making it appear a legitimate enterprise, takes a high level of sophistication and forethought. To this end, one of the primary reasons defendant's scheme did run for so long was *because* defendant was able to market and sell his fraudulent scheme to investors as a legitimate investment enterprise through the use of the same tools, programs, documents, and services as those used by legitimate investment firms and businesses. Furthermore, defendant's scheme was able to take in as many investors and as much money as it did *because* it appeared legitimate and indistinguishable from other investment accounts with business such as Charles Swab, eTrade, or Fidelity Investments. Such characteristics indicate a high level of sophistication.

Defendant also went beyond simply creating seemingly legitimate asset management documents to impart legitimacy. While defendant argues that computers are merely necessary tools for online investing and the flat screen monitors in his house were not used as "props" to impart any particular impression on investors and were used for "different things," the Court notes that defendant has not specified what "different things" these

monitors were used for.  Further, the testimony of Mr. Scott Gaylon ("Mr. Gaylon"), an individual who invested with defendant and testified as a victim at the evidentiary hearing [Doc. 83, pp. 55-60], belies this argument.  Mr. Gaylon testified that he visited defendant's house with his family and defendant brought Mr. Gaylon and his family into the room depicted in Exhibit 11, a room with a number of flat screen computer monitors positioned on the walls.  Mr. Gaylon, upon examination by the government regarding Exhibit 11, testified that:

> Q.  And did [defendant] show you - - what, if anything, did he tell you about what we see here in this picture?
>
> A.  He had all his computer monitors set up.  One of the first things he showed us when we went in was he showed us another investor's portfolio similar to ours. . . . .  It showed the investments for that year, for the year 2008 from January until September, that time, and showed the times were he traded. . . . .
>
> He also showed us how his computer programming or computer systems worked, that he could see when the big institutions would move and he would jump on and jump off. . . . .
>
> Q.  And in making his pitch to you did he make reference to these monitors?
>
> A.  Yes, yes.  The big monitor that he is looking at here. . . . - - that is where the other investor's portfolio was placed.  That is where he showed us that.  Then actually on this area here where the table is, he had four other monitors set up there as well.  That is where he showed us where [sic] how he invested and how he watched all of the different institutions and different trading, how to makes this trades and so on.

[Doc. 83, pp. 55-56].

In sum, the Court finds that a preponderance of the evidence proves that defendant's offense conduct, as a whole, was sophisticated and intricate because it required constant maintenance to ensure that it appeared to investors as a legitimate investment enterprise, required defendant to constantly monitor individual investment accounts and market and solicit new business, and required defendant to fool investors into believing they were receiving a profit on their investments. Accordingly, defendant's objection as to this two-level enhancement pursuant to § 2B1.1(b)(9)(C) is hereby overruled.

**2.    Enhancement for Violation of a Commodities Law, § 2B1.1(b)(17)(B), PSR ¶ 63**

Defendant also objects to the PSR's application of § 2B1.1(b)(17)(B) [PSR, ¶ 63], which provides for a four-level enhancement if an offense satisfies the following:

> [A] violation of commodities law and, at the time of the offense, the defendant was
>> (i)    an officer or director of a futures commission merchant or an introducing broker;
>> (ii)   a commodities trading advisor, or
>> (iii)  a commodity pool operator[.]

U.S.S.G. § 2B1.1(b)(17)(B).

Defendant argues that this enhancement should not apply to his conduct because it requires both that defendant be a commodities pool operator (a "CPO") and that a violation of a commodities law occurred, neither of which, defendant argues, apply to him and his conduct. Defendant asserts that he made it clear to each investor, through the investor agreements, that neither CAM nor its owners or principals were CPOs because each agreement explicitly provided that "CAM is not a Commodity Pool (CP) and the owners or

14

principals of CAM are not Commodity Pool Operators (CPO's)." [Doc. 85, p. 13]. Defendant also asserts that there is no allegation that he violated a commodities law, he was not convicted of a commodities law violation, and the default judgment entered against him in a related civil case, *Commodity Futures Trading Comm'n v. Dennis R. Bolze, [CAM], and [ATS]*, 3:09-CV-00088 (E.D. Tenn. July 6, 2010), is not an indication that he violated a commodities law.

The government argues that defendant, acting individually and through CAM and ATS (the corporations owned, operated, and controlled by defendant), conducted himself throughout the Ponzi scheme in a manner that satisfies the factors required for a CPO under § 2B1.1(b)(17)(B)(iii) and that defendant is personally liable for the actions of CAM and ATS because he admitted in his plea agreement that he controlled every action of these corporations [Doc. 43, p. 3]. *See* 7 U.S.C. § 13c(b). The government asserts that defendant acted as an unregistered CPO when he received wired funds from investors, pooled the funds, and then wired the pooled funds to a financial account to trade in the futures market under the name ATS. As support for this assertion, the government has submitted into evidence sealed Exhibit 7, a summary exhibit that charts the pooling of multiple investor funds into defendant's CAM bank account from June 17, 2003 through July 2, 2003 ["Exhibit 7," Doc. 71-2, pp. 15-29]. The government asserts that sealed Exhibit 7 shows that once defendant pooled his investors' funds into the CAM bank accounts, $175,000.00 of the funds in those accounts were transferred to ATS's MAN Financial trading account [*Id.*, p. 15]. Once these funds were transferred to the MAN Financial trading account, the government asserts that

defendant then traded these funds in the futures market in the name of ATS, not the names of the individual investors [*Id.*, pp. 26-29].

The government also argues that defendant's offense conduct involved a violation of a commodities law even without a conviction because, under the guidelines, no conviction is required. *See* U.S.S.G. § 2B1.1(b)(17) cmt. app. n.14(B).[8] According to the government, a violation of a commodities law occurred because defendant, CAM, and ATS were not registered CPOs [*see* "Exhibit 14," Doc. 69-7, pp. 3-33],[6] and defendant, acting through CAM and ATS, received wired funds from investors and wired these pooled funds to the MAN Financial account to trade in the futures market under the name ATS [*see, e.g.,* "Exhibit 7," Doc. 71-2, pp. 15-29]. Such conduct, the government asserts, is conduct that satisfies the requirements for the enhancement for a commodities law violation.

A commodity "pool" is defined in 17 C.F.R. § 4.10(d)(1) as "any investment trust, syndicate or similar form of enterprise operated for the purpose of trading commodity interests." 17 C.F.R. § 4.10(d)(1). A CPO is defined in 7 U.S.C. § 1a(5) as:

> [A]ny person engaged in a business that is of the nature of an investment trust, syndicate, or similar form of expertise, and who, in

---

[8] "A conviction under a securities law or commodities law is not required in order for subsection (b)(17) to apply. This subsection would apply in the case of a defendant convicted under a general fraud statute if the defendant's conduct violated a securities law or commodities law." U.S.S.G. § 2B1.1(b)(17) cmt. app. n.14(B).

[6] The government's Exhibit 14 contains a declaration from Michael Tallarico, a senior futures trading investigator with the Commodity Futures Trading Commission, and accompanying certifications from Sandra A. Guard, a document research supervisor and deputy record custodian with the National Futures Association. The declaration and accompanying certifications state that neither defendant, CAM, nor ATS were registered CPOs [Doc. 69-7, pp. 3-33].

connection therewith, solicits, accepts, or receives from others funds, securities, or property . . . for the purpose of trading in any commodity for future delivery on or subject to the rules of any contract market or derivatives transaction execution facility.

7 U.S.C. § 1a(5). In other words, a CPO "must engage in a business of a particular form; it must solicit, accept, or receive funds . . . and the solicitation must have a particular purpose–trading commodity futures." *CFTC v. Equity Financial Group, LLC*, 572 F.3d 150, 156 (3rd Cir. 2009). While the solicitation, acceptance, or receipt of funds must be for the purpose of trading, "nothing in the statute imposes an actual trading requirement." *CFTC*, 572 F.3d at 156. Accordingly, "actual trading of commodity futures is not required" for a person or entity to be deemed a CPO. *Id.* at 158. Rather, the primary characteristics of a CPO are: "combin[ing] investor funds into a single, commingled account; participants share pro rata in any profits and losses; and funds are invested or traded collectively, on behalf of the entire account, rather than in the name of individual investors." *Id.*

The Court finds that a preponderance of the evidence demonstrates that the investor funds defendant actually invested were traded as a pool and thus, defendant was a CPO as that term is defined in 7 U.S.C. § 1a(5). The Court's review of the stipulated factual basis in the plea agreement indicates that defendant solicited money from investors on the auspices that he would invest this money and trade the investors' funds for profit. Further, the Court has reviewed sealed Exhibit 7 and finds that it supports the finding that defendant acted, at least throughout the relevant time period in the exhibit, as a CPO because defendant combined multiple investors' funds, transferred these funds into another account, and then

traded the funds collectively, rather than in the names of the individual investors [*see* "Exhibit 7," Doc. 71-2, pp. 15-29]. The Court is also unpersuaded by defendant's argument that he cannot be a CPO because the investor agreements stated that he and CAM were not CPOs. On the contrary, the definition of a CPO applies to defendant because of his conduct and how he perpetrated his offense–and, on the whole, his actions speak louder than the disclaimers in the documents created by defendant to perpetuate his scheme.

As to whether defendant's conduct constitutes a violation of a commodities law, the commentary to § 2B1.1(b)(17) provides that "[a] conviction under . . . commodities law is *not required* in order for subsection (b)(17) to apply." U.S.S.G. § 2B1.1(b)(17) cmt. app. n.14(B) (emphasis added). Rather, this section applies "in the case of a defendant convicted under a general fraud statute if the defendant's conduct violated a . . . commodities law." *Id.* The commentary also states that a "'commodities law' means (i) the Commodity Exchange Act (the "CEA") (7 U.S.C. §§ 1, *et seq.*); and (ii) includes the rules, regulations, and orders issued by the Commodity Futures Trading Commission." U.S.S.G. § 2B1.1(b)(17) cmt. app. n.14(A). According to the CEA,

> [It is] unlawful for any . . . commodity pool operator, unless registered under this chapter, to make use of the mails or any means or instrumentality of interstate commerce in connection with his business as . . . [a] commodity pool operator.

7 U.S.C. § 6m(1) (2006). Further, "any person who, directly or indirectly, controls any person who has violated any provision of this chapter or any of the rules, regulations, or orders issued pursuant to this chapter may be held liable for such violation in any action

brought by the Commission to the same extent as such controlled person." *Id.* § 13c(b) (2006).

In light of the above, the Court finds that a preponderance of the evidence supports the conclusion that defendant's conduct constitutes a violation of a commodities law, notwithstanding the fact that defendant has not been convicted of a commodities law violation. In so holding, the Court notes that neither defendant, ATS, or CAM were registered CPOs [*see* "Exhibit 14," Doc. 69-7, pp. 3-33] and the only evidence defendant has submitted in opposition to this position is that the investor agreements contain a statement that neither defendant nor CAM were CPOs. In addition, and based on the evidence contained in sealed Exhibit 7, a preponderance of the evidence supports the conclusion that defendant, acting through ATS and CAM, acted as an unregistered CPO, received wired funds from investors, pooled the investors' funds, and then wired the pooled funds to the MAN financial accounts to trade in the futures market under the name ATS [*see* "Exhibit 7," Doc. 71-2, pp. 15-29]. Accordingly, the Court concludes that a preponderance of the evidence shows that defendant's offense conduct was of a type constituting a violation of a commodities law. Furthermore, the Court has also reviewed the charges and the default judgment entered against defendant, CAM, and ATS in *Commodity Futures Trading Comm'n v. Dennis R. Bolze, [CAM], and [ATS]*, 3:09-CV-00088 (E.D. Tenn. July 6, 2010), the civil case in which a default judgment was entered on July 6, 2010 against defendant [*see* Case No. 3:09-CV-00088, Doc. 47]. This case involves allegations and subsequent default judgments for violations of commodities laws in accordance with the situation described in

sealed Exhibit 7, *i.e.*, allegations that defendant issued false statements to pool operators, falsely depicted the account balances of the individual pool participants, and provided pool participants with false depictions of their accounts through fabricated "Trader Invoices." [*see* Case No. 3:09-CV-00088, Doc. 47, pp. 9-13]. *See* 7 U.S.C. §§ 6b(a)(2), 6o(1), 4b(a)(1).

In sum, the Court finds, by a preponderance of the evidence, that defendant and the corporations he controlled acted as CPOs and defendant's offense conduct constituted a violation of a commodities law. Accordingly, defendant's objection as to this four-level enhancement pursuant to § 2B1.1(b)(17)(B) is hereby overruled.

### 3. Enhancement for Abuse of Trust, § 3B1.3, PSR ¶ 66

Defendant next objects to the PSR's application of § 3B1.3 [PSR, ¶ 66], which provides for a two-level enhancement for abuse of a position of trust. U.S.S.G. § 3B1.3. This enhancement may only potentially apply to defendant's offense conduct if the Court determines that the four-level enhancement for a violation of a commodities law does not apply. *See* U.S.S.G. § 2B1.1(b)(17) cmt. app. n.7(E)(i) (stating that "[i]f subsection (b)(17) applies, do not apply § 3B1.3"). Because the Court has concluded that a preponderance of the evidence supports the application of the four-level enhancement for a commodities law violation pursuant to § 2B1.1(b)(17)(B), the Court finds that the enhancement for abuse of trust pursuant to § 3B1.3 should not apply.

### 4. Enhancement for Vulnerable Victim, § 3A1.1(b)(1), PSR ¶ 64

Defendant also objects to the PSR's application of § 3A1.1(b)(1) [PSR, ¶ 64], which provides for a two-level enhancement if a defendant "knew or should have known that a

victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1). The application note for this section defines "vulnerable victim" as a person "(A) who is a victim of the offense of conviction and any conduct for which the defendant is held accountable under [§ 1B1.3] (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1(b) cmt. app. n.2; *see United States v. Anderson*, 440 F.3d 1013, 1017 (8th Cir. 2006). For this enhancement to apply, the government need only prove, by a preponderance of the evidence, that one of defendant's victims was vulnerable within the meaning of this enhancement. *Anderson*, 440 F.3d at 1017.

Defendant first argues that the PSR determined that the victims of defendant's offense were mostly elderly retired individuals or individuals nearing retirement and that there is no proof in the record for such a determination. Defendant also argues that the Court should not consider the victim impact testimony given at the evidentiary hearing as evidence that the victims were vulnerable [Doc. 85, p. 2]. Further, defendant states that even if the Court finds that the victims were elderly or retired, a victim must be "unusually vulnerable" for this enhancement to apply and the PSR's determination, that the victims were mostly elderly and retired, or nearing retirement, does not render them unusually vulnerable because age alone does not imply vulnerability for the purposes of this enhancement. As support, defendant points to a court of appeals case from the Eighth Circuit in which the court found that "[a]s a group, older persons are more experienced investors, so it would be clear error to impose a § 3A1.1(b)(1) increase simply because some of the victims of a widespread investment

scam were elderly." *See United States v. Anderson*, 349 F.3d 568, 572 (8th Cir. 2003).

Defendant asserts that the victims invested with him for the purpose of seeking higher returns and the fact that they now find themselves in a financial bind is irrelevant to whether they were unusually vulnerable at the time of their initial investments. Defendant also argues that there is no evidence that any investors had mental problems or were unaware of the nature of their actions when investing with defendant. On the contrary, defendant asserts that no one was forced to invest with him and maintains that most of his investors were business people with financial knowledge who were only investing their discretionary income. Defendant also asserts that he did not know or deal directly with many of the investors and he could not have known whether they were "unusually vulnerable." Defendant also asserts that it was Dobbie, and not defendant, who solicited and found the European investors and brought their money to defendant.

The government argues that the Court can consider victim impact statements and the victim impact testimony in determining whether enhancements apply and that such statements and testimony support the application of this particular enhancement. To this end, the government has highlighted a number of victim impact statements, arguing that these statements indicate defendant focused on individuals nearing retirement and convinced them that his investment strategies would provide them with necessary financial security to prevent

them from feeling vulnerable to financial stress in their retirement [*see* Doc. 69, pp. 13-18].[7]

The government also argues that, at the hearing, defendant tried to distance himself from any knowledge concerning the vulnerability of his European investors and that he attempted to lay blame for his conduct on Dobbie. The government argues that the statement of Victim

---

[7] Victim R.A. states that ". . . we invested our life savings with CAM on advice of friends who are now in a similar nightmare situation as myself." ["Exhibit 10-A," Doc. 69-6, p. 24].

Victim G.B. states that "[w]e first met [defendant] in August 2005 when he came to Mallorca to make a presentation of his investment plan (CAM). With hindsight it is obvious that we were naive but the way in which he explained his investment strategy and his standing with the Chicago Mercantile Exchange seemed very plausible at the time." [*Id.*, p. 25].

Victim N.B. states that "[defendant] has now robbed us of what we worked so hard for all our lives and, unlike younger people, we have now run out of time to recuperate our losses. He callously preyed upon honest, hardworking people, and stole from them for his own selfish greed, to furnish [his] own lavish lifestyle. . . . We never expected the luxury of an indulgent lifestyle . . . . But we did feel we had earned a few peaceful years in retirement, knowing that we could meet our basic needs and live without the financial nightmare that will now be ours. [Defendant] has robbed us of all hope of that, only to satisfy his own greed and indulge himself and his family in a lifestyle that we could only dream of." [*Id.*, p. 27].

Victims C.C. and S.C. state that "We met [defendant] through our son [] (also a victim). Our investment with [defendant] began in June 2003 and was intended to be discretionary funds to help with grandchildren education. By the time we retired we had invested $75,000. At that time [defendant] was proposed new investment opportunities that would be ideal for retired/retiring seniors." [*Id.*, p. 30].

Victims P.S. and J.S. state that ". . . As for our case, we have lost a great deal of money which would have afforded us a comfortable retirement. We have lost our health. We have both suffered nervous breakdowns. [] had seriously considered suicide. We worked very hard for 30 years for our money. . . . [Defendant] knew we took early retirement to sail our dream as [victim] had suffered from breast cancer." [*Id.*, p. 43].

Victim S.S. states that ". . . My wife and I . . . are victims . . . . [Defendant] was a very convincing man who knowingly bilked me of money I will need in retirement. I will probably now not be able to retire at all." [*Id.*, p. 45].

W.L., read to defendant at the hearing, shows that defendant's attempts fail to distance him from knowledge of the vulnerability of his European victim investors:

> [Defendant] came to Mallorca twice and gave a seminar each time to a group of investors/prospective investors. He gave well organized presentations and was very plausible. He also explained how it gave him pleasure to "help" the smaller less well off clients as their need was greater.

["Exhibit 10-A," Doc. 69-6, p. 40].[8]

As an initial matter, the Court notes that it agrees with the government that the Court may take into consideration victim impact statements and victim testimony in determining whether special offense characteristics apply to a defendant. As stated *supra*, in determining a relevant but disputed sentencing factor, a court may rely on evidence, including victim impact statements, that might be inadmissible in another procedural setting. *See, e.g., Clark*, 335 F. App'x at 184; *Gibson*, 985 F.2d at 865; U.S.S.G. § 6A1.3; Fed. R. Evid. 1101(d)(3). Accordingly, after a review of the victim impact statements, and after reviewing the evidence, argument, and testimony presented at the hearing, the Court finds that a preponderance of the evidence clearly supports the conclusion that at least one of the victims in this case was unusually vulnerable.

For instance, the victim impact statement of Victim G.B. is indicative of financial insecurity and vulnerability ["Exhibit 10-A," Doc. 69-6, p. 25]. Victim G.B. is a European investor who states that she met defendant in August 2005 when defendant traveled to

---

[8] At the hearing, defendant testified that it was possible he made this statement, but claimed he did not remember saying it [Doc. 83, p. 148].

Mallorca to make a presentation on CAM [*Id.*].  She states that she and her husband, both in their late sixties, planned for their retirement by moving to a smaller house which freed up capital and enabled them to invest with CAM [*Id.*].  They planned to use the profits from their CAM investment as a regular source to supplement their monthly pension of approximately $600 a month [*Id.*].  Victim G.B. goes on to state that she and her husband invested with defendant as a way to obtain financial security–a goal defendant offered them based on fraudulent representations, and one they can no longer obtain due to defendant's conduct.

The Court also finds the situation of Victim K.E. to be indicative of unusual vulnerability ["Exhibit 14," Doc. 69-6, pp. 33-34].  Victim K.E. states in his victim impact statement that a friend recommended defendant and his investment business and that defendant met with him, showed him his office, his computers, and detailed to him the workings of defendant's investment operations [*Id.*].  Victim K.E. also received two emails a week itemizing how his investments with defendant were growing [*Id.*].  Victim K.E. states that he works in the ministry, has a very low income, and has been devastated mentally, emotionally, and financially by defendant's offenses [*Id.*].  Further, "[t]he actual money we invested was my inheritance and was to be used for my son's college and our retirement. Now we can never retire and do not have it to use for my son's college education." [*Id.*].

The Court agrees that age alone is not enough to uphold an enhancement under § 3A1.1(b)(1).  However, many of the victims in this case invested large sums of money that they intended to depend on throughout their retirement.  Further, many of the victims were

retired, removed from the work force, and neither wealthy nor asset management savvy. Accordingly, the Court finds that the victims' ages, combined with defendant's representations that investing with defendant and CAM was the right decision *because* of victims' professed fears of financial instability in their retirement, indicates unusually vulnerability in regard to financial matters. The victims' statements indicate that many were convinced by defendant that an investment with him would be safe–contrary to defendant's assertion that his victims were simply willing to take on more risky investments.[9] Furthermore, the Court's review of these statements indicates that many of the victims were investing nondiscretionary funds they intended to use for their basic needs and to provide them with an income on which to live in their retirement.

In addition, the Court finds that a preponderance of the evidence supports the conclusion that defendant knew or was aware of the vulnerabilities of these victims because, from the Court's review of the victim impact statements, several of the victims were in or about to enter retirement, defendant had personal dealings with the victims, going so far as to bring them to his home, and defendant expressly told them that the investment strategies he was advocating were ideal for people of their situation [*see, e.g.,* "Exhibit 10-A," Doc. 69-

---

[9] While the Court has noted defendant's argument that the vulnerability of the victims should not be looked at from the position of the victims as they stand today, but from the time of their initial investments, the Court notes that for many of these victims, the money they invested with defendant was intended to go to the very expenditures they are now unable to cover. As indicated by the victim impact statements, the loss of funds that were invested with defendant has not only affected the victims' financial stability but also their health and the well-being of their families. Many of these victims invested money in order to pay for their everyday necessities, their own health care, and their children or grandchildren's education.

6, pp. 25, 27, 30, 31-32, 33-34, 40-42]. Thus, even if defendant was not aware of the vulnerable situations of his European investors, despite defendant's traveling to Mallorca to present his investment strategy and speak with the overseas investors, the Court finds that defendant was aware of the situation and the unusual vulnerability of a number of his victims–individuals who were leaving or soon to be leaving the work force, and who invested nondiscretionary retirement funds in order to avoid feared financial insecurity in their retirement.

In sum, the Court finds that defendant knew or should have known that at least one of his victims was vulnerable and thus, defendant's objection as to this two-level enhancement pursuant to § 3A1.1(b)(1) is hereby overruled.

### 5. Enhancement for a Large Number of Vulnerable Victims, § 3A1.1(b)(2), PSR ¶ 65

Defendant's final objection is to the PSR's application of § 3A1.1(b)(2) [PSR, ¶ 65], which provides for an additional two-level enhancement if a defendant's offense "involved a large number of vulnerable victims." U.S.S.G. § 3A1.1(b)(2). Defendant asserts that this enhancement should not apply in light of the PSR's application of § 2B1.1(b)(2)(B), the application of which added four levels to defendant's total offense level because his offense involved more than fifty victims. *Id.* § 2B1.1(b)(2)(B). The application note to this section provides that "[i]f subsection (b)(2)(B) or (C) applies, an enhancement under § 3A1.1(b)(2) shall not apply." *Id.* at cmt. app. n.4(D). The government concedes that § 3A1.1(b)(2) does not apply due to the application of § 2B1.1.

The Court agrees with defendant that the enhancement under § 3A1.1(b)(2) does not apply in light of the application of § 2B1.1. Thus, this objection is sustained.[10]

## B. Adjustment for Acceptance of Responsibility, PSR ¶ 76

In light of defendant's agreement to plead guilty, the plea agreement in this case provides that the government would not, subject to certain conditions, oppose a two-level reduction for acceptance of responsibility under § 3E1.1(a) of the guidelines [Doc. 43, pp. 13-14]. The government also agreed to move, at or near the time of sentencing, for the Court to decrease defendant's total offense level by one additional level, pursuant to § 3E1.1(b) [*Id.*, p. 14]. However, the plea agreement expressly conditioned the government's agreement on the following:

> [S]hould the defendant engage in any conduct or make statements that are inconsistent with accepting responsibility for the defendant's offenses . . . the United States will be free not to make such motion or to withdraw such motion if already made, and will be free to recommend to the Court that the defendant not receive any offense level reduction for acceptance of responsibility under Section 3E1.1 of the [guidelines].

[*Id.*, p. 14]. Thus, according to the express terms of the plea agreement, the government's obligation to recommend an acceptance-of-responsibility reduction was contingent upon its determination that defendant continued, through his conduct and his statements, to accept responsibility for his offenses.

---

[10] In defendant's initial objections, defendant objected to the PSR's determination of the loss amount calculation pursuant to § 2B1.1(b)(1)(K) [PSR, ¶ 60]. Defendant also submitted to the Court amended objections to the PSR. However, defendant subsequently withdrew both the loss calculation objection and the amended objections to the PSR. Accordingly, the Court does not address these objections.

On April 13, 2010, the government filed a motion moving the Court for a one-level reduction in defendant's total offense level pursuant to § 3E1.1(b) [Doc. 63]. Following the filing of this motion, in the government's response to defendant's sentencing memorandum and objections, the government reiterated the provision of the plea agreement in which the parties agreed that the government reserves the right to oppose the reduction for acceptance of responsibility and to withdraw its motion for a one-level reduction [Doc. 69].

In the government's response to defendant's post-hearing brief, the government asserts that defendant's testimony at the evidentiary hearing was inconsistent with accepting responsibility for his offenses, including the scope and nature of his schemes to defraud and the scope of his criminal enterprise and because defendant asserted that he was not holding himself out as someone with whom funds could be entrusted for futures contract trading activities [Doc. 88, p. 11]. Accordingly, the government asserts that defendant is not entitled to any decrease in his total offense level for acceptance of responsibility. In addition, the government gives notice to the Court that, in the event the Court determines that defendant is not entitled to a reduction for acceptance of responsibility under § 3E1.1(a), the government will immediately withdraw its previously filed motion for one-level reduction.

Section 3E1.1(a) provides that "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels." U.S.S.G. § 3E1.1(a). Section 3E1.1(b) provides that if the defendant qualifies for a decrease under subsection (a), and upon motion by the government, the offense level may be decreased by one additional level. *Id.* § 3E1.1(b). The application notes to § 3E1.1 state that factors for a court to

consider when determining whether a defendant clearly demonstrates acceptance of responsibility for his offenses include:

> [T]ruthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct). . . . A defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility.

U.S.S.G. 3E1.1 cmt. app. n.1(a).

In light of the above, and because defendant has not had a chance to respond to the government's assertion that he be denied the reduction in his total offense level for acceptance of responsibility, the Court declines, at this time, to issue a ruling on whether denial of such a reduction is appropriate.

## III.    Conclusion

In sum, defendant's objections as to the following enhancements pursuant to three special offense characteristics under the guidelines are hereby **OVERRULED**: (1) defendant's objection to the two-level enhancement for sophisticated means, pursuant to § 2B1.1(b)(9)(C) and applied in paragraph 62 of the PSR; (2) defendant's objection to the four-level enhancement for violation of a commodities law, pursuant to § 2B1.1(b)(17) and applied in paragraph 63 of the PSR; and (3) defendant's objection to the two-level enhancement for at least one vulnerable victim, pursuant to § 3A1.1(b)(1) and applied in paragraph 64 of the PSR.

In addition, defendant's objections as to the following enhancements pursuant to two special offense characteristics under the guidelines are hereby **SUSTAINED**: (1) defendant's objection to the two-level enhancement for abuse of trust, pursuant to § 3B1.3 and applied in paragraph 66 of the PSR and (2) defendant's objection to the two-level enhancement for a large number of vulnerable victims, pursuant to § 3A1.1(b)(2) and applied in paragraph 65 of the PSR.

Furthermore, the Court declines to rule, at this time, on the government's request that defendant receive no reduction for acceptance-of responsibility pursuant to § 3E.1.1(a).

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE