UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>DENNIS ROGER BOLZE,<br>Defendant. | No. 3:09-cr-93<br><br>Judge Varlan |

**RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION FOR COMPASSIONATE RELEASE**

Bolze seeks immediate release due to concerns about contracting COVID-19 in light of his preexisting medical conditions. (Docs. 164, 165, 166, Motions.) The United States opposes that request because Bolze has not satisfied the requirements of 18 U.S.C. § 3582(c)(1)(A)(i).

The Court lacks authority to grant relief at this time because Bolze has not exhausted his administrative rights. If the Court reached the merits—though it should not—it should deny the motion with prejudice because Bolze has not met his burden to establish that a reduction is warranted under the statute. Any request for home confinement should likewise be denied.

**Factual Background**

**I.     Facts regarding Bolze's conviction and sentence**

For more than six years, Bolze perpetrated a $21 million Ponzi scheme through two corporations he owned and operated. *United States v. Bolze*, 444 F. App'x 889, 890 (6th Cir. 2012). He caused investors to wire money to him for investment and, of the $21 million he received, he invested only $1.6 million, used approximately $9.6 million to lull existing investors, and spent the rest to support his lavish lifestyle. *Id*. In 2009, he pleaded guilty to three counts of wire fraud and three counts of money laundering, for which he was sentenced to an aggregate term of 327 months' imprisonment. (Doc. 43, Plea Agreement; Doc. 94, Judgment.)

According to the Bureau of Prisons, Bolze is scheduled for release in June 2032 and is housed at FCI Coleman Low, where one inmate and one staff member have tested positive for COVID-19. COVID-19 Cases, Federal Bureau of Prisons, *available at* https://www.bop.gov/coronavirus/ (accessed Apr. 29, 2020).

## II. Facts regarding the COVID-19 pandemic and the Bureau of Prisons response to it

It is undisputed that COVID-19 has, in a short period of time, infected many people and caused many deaths. According to the Centers for Disease Control and Prevention, the United States has over 981,000 confirmed and presumed positive cases of COVID-19, and 55,258 people have already died as a result of the virus. COVID-19: U.S. at a Glance, Centers for Disease Control and Prevention, *available at* https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (accessed Apr. 29, 2020).

In response to that pandemic, the Bureau of Prisons (BOP) has taken significant measures to protect the health of the inmates in its charge, because "maintaining [the] safety and security of [its] institutions is [BOP's] highest priority." Updates to BOP COVID-19 Action Plan (Mar. 19, 2020), Federal Bureau of Prisons, *available at* https://www.bop.gov/resources/news/ 20200319_covid19_update.jsp (accessed Apr. 21, 2020). Indeed, BOP has had a pandemic influenza plan in place since 2012. *See* Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), BOP Health Services Division, *available at* https://www.bop.gov/ resources/pdfs/pan_flu_module_1.pdf (accessed Apr. 21, 2020). That protocol is lengthy and detailed, establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates. Consistent with that plan, BOP began planning for potential coronavirus transmissions

in January 2020. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan, to minimize the risk of COVID-19 transmission into and within its facilities. Since that time, as events require and in response to expert guidance, BOP has repeatedly revised its Action Plan to address the ongoing public-health crisis.

Beginning on April 1, 2020, BOP implemented Phase Five of the Action Plan, which currently governs operations. COVID-19 Action Plan: Phase Five, Federal Bureau of Prisons, *available at* https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp (accessed Apr. 21, 2020); *see also* BOP Implementing Modified Operations, Federal Bureau of Prisons, *available at* https://www.bop.gov/coronavirus/covid19_status.jsp (accessed Apr. 21, 2020). That plan includes (1) securing all inmates in their assigned cells/quarters for at least 14 days to stop the spread of the virus; (2) modifying operations to limit group gatherings, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access; (3) suspending all internal inmate movement, except for medical treatment or similar exigencies; (4) suspending social visits, while increasing the telephone allowance to 500 minutes per month; (5) suspending in-person legal visits; (6) screening all new arrivals, quarantining at-risk asymptomatic inmates, and isolating and testing symptomatic inmates; and (7) conducting enhanced health screening for staff in areas of sustained community transmission. Those measures help safeguard inmates against COVID-19 while providing them with any required medical care during this difficult time.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority previously authorized placement in home confinement for the last six months or ten percent of a sentence, whichever is shorter, 18 U.S.C. § 3624(c)(2), and for those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). But then Congress authorized BOP to "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" under § 3624(c)(2), so long as "the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau [of Prisons]." Coronavirus Aid, Relief, and Economic Security (CARES) Act, Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General made the requisite findings on April 3, 2020, and the Bureau of Prisons is now "urgently reviewing all inmates" to assess each inmate's vulnerability to COVID-19, whether home confinement would increase that inmate's risk of contracting COVID-19, and whether release to home confinement would risk public safety. Home Confinement, Federal Bureau of Prisons, *available at* https://www.bop.gov/resources/news/20200405_covid19_home_confinement.jsp (accessed Apr. 21, 2020). Since March 26, 2020, the Bureau of Prisons has placed 1,751 more inmates on home confinement. COVID-19 Home Confinement Releases, Federal Bureau of Prisons, *available at* https://www.bop.gov/coronavirus/ (accessed Apr. 29, 2020).

Taken together, these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to

adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

### Legal Framework

"[O]nce a court has imposed a sentence, it does not have the authority to change or modify that sentence unless such authority is expressly granted by statute." *United States v. Thompson*, 714 F.3d 946, 948 (6th Cir. 2013); *accord Dillon v. United States*, 560 U.S. 817, 825 (2010). One statute that authorizes sentence modifications is 18 U.S.C. § 3582(c)(1)(A), which allows this Court, in certain circumstances, to grant a defendant's motion to reduce his term of imprisonment. Before filing the motion, however, the defendant must first request that the Bureau of Prisons file such a motion on his behalf. 18 U.S.C. § 3582(c)(1)(A). A court may grant the defendant's own motion for a sentence reduction only if it was filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30 days have passed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

If that exhaustion requirement is met, a court may reduce a term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the Court finds, as relevant here, that (i) "extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). As the movant, Bolze bears the burden to establish that he is eligible for a sentence reduction. *E.g.*, *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

The Sentencing Commission has issued a policy statement addressing reduction of sentences under § 3582(c)(1)(A). As relevant here, the policy statement provides that a court

may reduce the term of imprisonment after considering the § 3553(a) factors if the Court finds that (i) "extraordinary and compelling reasons warrant the reduction;" (ii) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g);" and (iii) "the reduction is consistent with this policy statement." U.S.S.G. § 1B1.13.[1]

The policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." U.S.S.G. § 1B1.13, cmt. n.1(A)(i). Second, the standard is met if the defendant is:

> (I) suffering from a serious physical or medical condition,
>
> (II) suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13, cmt. n.1(A)(ii). The application note also sets out other conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's age and family circumstances. U.S.S.G. § 1B1.13, cmt. n.1(B)-(C). Lastly, the note recognizes

---

[1] The policy statement refers only to motions filed by the BOP Director, because it was last amended on November 1, 2018, and defendants were not entitled to file motions under § 3582(c)(1)(A) until the enactment of the First Step Act in December 2018. *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; *cf.* 18 U.S.C. § 3582(c) (2012). In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," 18 U.S.C. § 3582(c)(1)(A)(ii), and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by BOP, the policy statement should apply equally to motions filed by defendants.

the possibility that the Bureau of Prisons could identify other grounds that amount to

"extraordinary and compelling reasons." U.S.S.G. § 1B1.13, cmt. n.1(D).

**Arguments**

I.    **The Court lacks authority to grant compassionate release because Bolze has not exhausted his administrative remedies.**

This Court lacks authority to grant Bolze's motion for a sentence reduction at this time, because Bolze has not exhausted his administrative remedies nor waited 30 days after presenting his request to the Bureau of Prisons on April 7, 2020. (*See* Doc. 164, Motion at 7 (asserting that Bolze submitted his request to the warden on April 7, 2020).) As explained above, § 3582(c) requires that a request for a sentence reduction be presented first to BOP for its consideration; only after 30 days have passed, or the defendant has exhausted all administrative rights to appeal the BOP's failure to move on the defendant's behalf, may a defendant move for a sentence reduction in court. That restriction is mandatory and thus "presents a glaring roadblock foreclosing compassionate release at this point." *United States v. Raia*, 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020), *as revised* (Apr. 8, 2020). The vast majority of district courts to address this issue agree. *See, e.g.*, *United States v. Epstein*, 2020 WL 1808616, at *4 (D.N.J. Apr. 9, 2020) (collecting numerous cases); *United States v. McCann*, 2020 WL 1901089, at *2 (E.D. Ky. Apr. 17, 2020) ("The Court recognizes that these are unsettling times for everyone, including prisoners. But in such a context, the exhaustion requirement of the compassionate release statute is perhaps most important."); *United States v. Lugo*, 2020 WL 1821010, at *3 (D. Me. Apr. 10, 2020) ("The Court regards the language of section 3582(c) as both clear and mandatory."); *United States v. Alam*, 2020 WL 1703881 (E.D. Mich. Apr. 8, 2020) (collecting numerous cases holding that "the judiciary has no power to craft an exception to [exhaustion] requirements for defendants seeking release during the COVID-19 pandemic").

7

"'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances." *Dillon*, 560 U.S. at 824. As the Supreme Court has recognized, finality is an important attribute of criminal judgments, and one "essential to the operation of our criminal justice system." *Teague v. Lane*, 489 U.S. 288, 309 (1989) (plurality opinion). Accordingly, once a court has pronounced sentence and that sentence becomes final, the court has no inherent authority to reconsider or alter that sentence and may do so only if authorized by statute. *See, e.g.*, *United States v. Addonizio*, 442 U.S. 178, 189 & n.16 (1979). Consistent with that principle of finality, § 3582(c) provides that a court generally "may not modify a term of imprisonment once it has been imposed," except in three circumstances: (i) upon a motion for reduction in sentence under § 3582(c)(1)(A), such as that at issue here; (ii) "to the extent otherwise expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure," § 3582(c)(1)(B); and (iii) if the defendant was sentenced "based on" a retroactively lowered sentencing range, § 3582(c)(2).

Given the plain language and purpose of the statute, the requirements for filing a sentence-reduction motion—including the requirement that a defendant exhaust administrative remedies or wait 30 days before filing a motion in court—are properly viewed as jurisdictional. Section 3582(c) says a "court may not modify" a term of imprisonment except in enumerated circumstances. 18 U.S.C. § 3582(c). It thus "speak[s] to the power of the court rather than to the rights or obligations of the parties," *Landgraf v. USI Film Prods.*, 511 U.S. 244, 274 (1994) (internal quotation marks omitted), delineating "when, and under what conditions," a court may exercise its "'adjudicatory authority,'" *Bowles v. Russell*, 551 U.S. 205, 212-13 (2007) (quoting *Eberhart v. United States*, 546 U.S. 12, 16 (2005) (per curiam)). That conclusion is reinforced by the historical powerlessness of the courts to modify a sentence after the expiration of the term at

8

which it was entered. *See United States v. Mayer*, 235 U.S. 55, 67-69 (1914). Section 3582(c) is thus best understood as conferring the jurisdictional authority previously lacking—by providing express statutory authorization to modify otherwise final sentences in limited circumstances.

Whether a prescription is jurisdictional turns on Congress's intent, which is properly determined by the text, context, relevant historical treatment, and purpose of the provision. *Henderson v. Shinseki*, 562 U.S. 428, 436 (2011); *see also Fort Bend Co. v. Davis*, 139 S. Ct. 1843, 1848-50 (2019) (cautioning against imprecise use of the "jurisdictional" label, because even mandatory statutory claim-processing rules are presumed to be nonjurisdictional absent a clear statement to the contrary). Here, the relevant factors indicate that Section 3582(c) sets forth a jurisdictional limitation on a district court's authority to modify a sentence.[2] *E.g.*, *United States v. Hofmeister*, No. CV-5:16-cr-13, 2020 WL 1811365, at *1 (E.D. Ky. Apr. 9, 2020) (denying request to "waive these prerequisites given the dangers posed by COVID-19" and deeming the prerequisites "jurisdictional").

Even if this Court were to hold that the exhaustion requirement of Section 3582(c)(1)(A) is not jurisdictional, it is at least a mandatory claim-processing rule and thus must be enforced if a party "properly raise[s]" it. *Eberhart*, 546 U.S. at 19 (holding that Fed. R. Crim. P. 33, which permits a defendant to move for a new trial within 14 days of the verdict, is a nonjurisdictional but mandatory claim-processing rule); *United States v. Gaytan-Garza*, 652 F.3d 680, 681 (6th Cir. 2011) (per curiam) (holding that Fed. R. App. P. 4(b), which establishes the time period for a criminal defendant to file a notice of appeal, is a nonjurisdictional rule that must be enforced where the government raises it). The United States raises the rule here, and it must be enforced.

---

[2] Similarly, the prerequisites for relief under Section 3582(c)(2), which allows a sentence reduction based on a retroactive guideline amendment, have been deemed jurisdictional. *E.g.*, *United States v. Williams*, 607 F.3d 1123, 1125-26 (6th Cir. 2010).

Although judicially-created exhaustion requirements may sometimes be excused, courts cannot ignore statutory commands such as that presented in Section 3582(c)(1)(A). *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992) ("[w]here Congress specifically mandates, exhaustion is required"). The Supreme Court reaffirmed that principle in *Ross v. Blake*, 136 S. Ct. 1850 (2016), when rejecting a judicially-created "special circumstances" exception to the exhaustion requirement in the Prison Litigation Reform Act of 1995. Rejecting the "freewheeling approach" adopted by some courts of appeals, under which some prisoners were allowed to pursue litigation even where they had failed to exhaust available administrative remedies, *Ross*, 136 S. Ct. at 1855, the Supreme Court demanded fidelity to the statutory text, explaining that the "mandatory language" of the exhaustion requirement "means a court may not excuse a failure to exhaust" even to accommodate exceptional circumstances, *id.* at 1856.

Contrary to Bolze's suggestion (*e.g.*, Doc. 164, Motion at 7-8), no "futility" exception exists for statutory exhaustion requirements. *See, e.g., United States v. Holden*, 2020 WL 1673440, at *5 (D. Or. Apr. 6, 2020); *United States v. Eberhart*, 2020 WL 1450745, at *1 (N.D. Cal. Mar. 25, 2020). A few courts have incorrectly excused the § 3582 exhaustion requirement as futile in light of the present pandemic, but several of those decisions have rested on the fact that the defendant only had a few days left on the sentence, a consideration not present here. *See Colvin*, 2020 WL 1613943, at *1 (finding exhaustion futile because inmate had 11 days left on her sentence); *United States v. Perez*, 2020 WL 1546422, at *1 (S.D.N.Y. Apr. 1, 2020) (finding exhaustion futile because inmate had less than 21 days left on his sentence and was recovering from two vicious beatings while in prison); *but see United States v. Zukerman*, 2020 WL 1659880, at *1 (S.D.N.Y. Apr. 3, 2020) (finding exhaustion futile where obese, 75-year old inmate suffered from diabetes and hypertension). And at least one of those decisions incorrectly

relied on precedent addressing a judicially created—as opposed to statutorily created—exhaustion requirement.  *See Perez*, 2020 WL 1546422 at *2 (relying only on *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019)).  The requirement of a 30-day period to allow BOP the initial review of the defendant's request therefore cannot be excused.[3]

In short, although Congress expanded the availability of compassionate release when it enacted the First Step Act of 2018, it also expressly imposed on inmates the requirement of initial resort to administrative remedies.  And that is for good reason:  BOP completes an extensive assessment for such requests.  *See* 28 C.F.R. § 571.62(a); BOP Program Statement

---

[3]  A handful of district courts, mostly in the Second Circuit, have disregarded the exhaustion requirement.  But nearly every other district court to have considered the issue in a reported decision agrees with *Raia*—and the position of the United States—that the 30-day requirement is mandatory and must be enforced.  *See, e.g.*, *United States v. Ogarro*, 2020 WL 1876300, at *3 (S.D.N.Y. Apr. 14, 2020) ("In fact, section 3582(c)'s exhaustion proscription is clear as day.");  *United States v. Fevold*, 2020 WL 1703846, at *1 (E.D. Wis. Apr. 8, 2020) ("Not only is exhaustion of administrative remedies required as a matter of law, but it also makes good policy sense.  The warden and those in charge of inmate health and safety are in a far better position than the sentencing court to know the risks inmates in their custody are facing and the facility's ability to mitigate those risks and provide for the care and safety of the inmates.");  *accord United States v. Smith*, 2020 WL 1903160 (D. Conn. Apr. 17, 2020);  *United States v. Allen*, 2020 WL 1878774 (N.D. Ohio Apr. 15, 2020);  *United States v. Meron*, 2020 WL 1873900 (E.D. Cal. Apr. 15, 2020);  *United States v. Schultz*, 2020 WL 1872352 (W.D.N.Y. Apr. 15, 2020);  *United States v. Petrossi*, 2020 WL 1865758 (M.D. Pa. Apr. 14, 2020);  *United States v. Rabadi*, 2020 WL 1862640, at *3 (S.D.N.Y. Apr. 14, 2020);  *United States v. Fuller*, 2020 WL 1847751 (W.D. Wash. Apr. 13, 2020);  *United States v. Hembry*, 2020 WL 1821930 (N.D. Cal. Apr. 10, 2020);  *United States v. Feiling*, 2020 WL 1821457 (E.D. Va. Apr. 10, 2020);  *United States v. Lugo*, 2020 WL 1821010, at *3 (D. Me. Apr. 10, 2020);  *United States v. Boyles*, 2020 WL 1819887 (D. Kan. Apr. 10, 2020);  *United States v. Gillis*, 2020 WL 1846792 (C.D. Cal. Apr. 9, 2020);  *United States v. Reeves*, 2020 WL 1816496 (W.D. La. Apr. 9, 2020);  *United States v. Annis*, 2020 WL 1812421, at *2 (D. Minn. Apr. 9, 2020);  *United States v. Hofmeister*, 2020 WL 1811365, at *3 (E.D. Ky. Apr. 9, 2020);  *United States v. Epstein*, 2020 WL 1808616 (D.N.J. Apr. 9, 2020);  *United States v. Carter*, 2020 WL 1808288 (S.D. Ind. Apr. 9, 2020);  *United States v. Eisenberg*, 2020 WL 1808844 (D.N.H. Apr. 9, 2020);  *United States v. Holden*, 2020 WL 1673440 (D. Or. Apr. 6, 2020);  *United States v. Perry*, 2020 WL 1676773 (D. Colo. Apr. 3, 2020);  *United States v. Johnson*, 2020 WL 1663360, at *3-*6 (D. Md. Apr. 3, 2020);  *United States v. Carver*, 2020 WL 1604968 (E.D. Wash. Apr., 1, 2020);  *United States v. Zywotko*, 2020 WL 1492900 (M.D. Fla. Mar. 27, 2020).

5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation, *available at* https://www.bop.gov/policy/progstat/5050_050_EN.pdf (last accessed Apr. 21, 2020). The provision of § 3582(c)(1)(A) prioritizing administrative review therefore makes sense not only in the ordinary case, but also at this perilous time. As the Third Circuit has held, "[g]iven BOP's shared desire for a safe and healthy prison environment, . . . strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Raia*, 2020 WL 1647922, at *2.

Bolze's motion is unreviewable because he has not satisfied § 3582(c)(1)(A)'s exhaustion requirement. (Although described as an "exhaustion requirement" throughout this response, the statute is clear that an inmate need not "exhaust" administrative remedies if he waits to file in court until 30 days after the warden has received his request.) Bolze has not even alleged that he has sought to appeal the warden's April 10, 2020 denial of his request for compassionate release (Doc. 166, Exhibit A, Denial), as permitted by 28 C.F.R. § 571.63(a). And only a denial for compassionate release at the level of BOP's director or general counsel constitutes a "final administrative decision" that cannot be further appealed within the administrative remedies program. *See* 28 C.F.R. § 571.63(b), (d). Absent such a decision, Bolze has not exhausted his administrative rights and must therefore wait for the expiration of the 30-day period provided by statute before he can petition this Court for relief. The Court should deny Bolze's motion without prejudice to Bolze's ability to refile after he has exhausted his administrative rights or after May 7, 2020, *i.e.*, when 30 days will have passed after he submitted his initial request.

## II.    In any event, Bolze has not established "extraordinary and compelling reasons" warranting his immediate release.

As explained above, the relevant provision of § 3582(c) allows a sentence reduction only if this Court determines that "extraordinary and compelling reasons" justify the reduction and

that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). The Sentencing Commission's policy statement defines "extraordinary and compelling reasons" to include, as relevant here, certain specified categories of medical conditions. U.S.S.G. § 1B1.13, cmt. n.1(A).

      A.    <u>Bolze has not established that his medical condition amounts to an extraordinary and compelling reason warranting his immediate release.</u>

To state a cognizable basis for a sentence reduction based on a medical condition, a defendant first must establish that his condition falls within one of the categories listed in the policy statement. Those categories include (i) any terminal illness, and (ii) any "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. 1B1.13, cmt. n.1(A). If a defendant's medical condition does not fall within one of the categories specified in the application note (and no other part of the application note applies), his motion must be denied.

The COVID-19 pandemic, which poses a threat to every non-immune person worldwide, does not fall into either of those categories and therefore could not alone provide a basis for a sentence reduction. *E.g.*, *United States v. Korn*, 2020 WL 1808213, at *6 (W.D. N.Y. Apr. 9, 2020) ("the mere *possibility* of contracting a communicable disease such as COVID-19, without any showing that the Bureau of Prisons will not or cannot guard against or treat such a disease, does not constitute an extraordinary or compelling reason for a sentence reduction under the statutory scheme."). The categories encompass specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. As the Third Circuit has held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *Raia*, 2020 WL 1647922 at

*2; *see also Eberhart*, 2020 WL 1450745 at *2 ("a reduction of sentence due solely to concerns about the spread of COVID-19 is not consistent with the applicable policy statement of the Sentencing Commission as required by § 3582(c)(1)(A)."). To classify COVID-19 as an extraordinary and compelling reason would be inconsistent with the text of the statute and the policy statement, would be detrimental to BOP's organized and comprehensive anti-COVID-19 regimens, could result in the scattershot treatment of inmates, and would undercut the strict criteria BOP employs to determine individual inmates' eligibility for sentence reductions and home confinement. Section 3582(c)(1)(A) contemplates sentence reductions for specific individuals, not the widespread prophylactic release of inmates and the modification of lawfully imposed sentences to deal with a global viral pandemic.

That does not mean, however, that COVID-19 is irrelevant to a court's analysis of a motion under § 3582(c)(1)(A). If, for example, an inmate has a chronic medical condition that has been recognized by the Centers for Disease Control as elevating the risk of becoming seriously ill from COVID-19, that condition may possibly satisfy the standard of "extraordinary and compelling reasons." *See* Groups at Risk for Severe Illness, Centers for Disease Control, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (accessed Apr. 29, 2020). The chronic condition (*i.e.*, one "from which [the defendant] is not expected to recover") could possibly be deemed sufficiently "serious" as to "substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility," even if that condition would not have been an "extraordinary and compelling reason" absent the risk of COVID-19. U.S.S.G. § 1B1.13, cmt. n.1(A)(ii)(I). As part of its analysis of the totality of circumstances, the Court should consider whether an inmate is more likely to contract COVID-19 if he is released than if he remains incarcerated. In most

cases, that will depend in part on the inmate's proposed release plans and whether a known outbreak has occurred at his institution.

Contrary to Bolze's assertion that the "unabated and advancing COVID-19 virus [is] spreading" at his facility (Doc. 164, Motion at 2), the number of individuals at that facility with COVID-19 actually seems to be decreasing. Before April 24, 2020, the Bureau of Prisons reported that one inmate and three staff members at FCI Coleman Low had tested positive for COVID-19. *See United States v. Harris*, No. 2:12-cr-14, 2020 WL 1969951, at *1 (M.D. Fla. Apr. 24, 2020). Today, only one inmate and one staff member are positive, the other two staff members having recovered. *See* COVID-19 Cases, Federal Bureau of Prisons, *available at* https://www.bop.gov/coronavirus/ (accessed Apr. 29, 2020) (explaining that the daily totals for each facility reflect "open" cases). That fact suggests that BOP is effectively limiting the spread of COVID-19. Bolze claims that his health is "poor and deteriorating," but most of the medical conditions he mentions were preexisting when he was originally sentenced; only his "advancing kidney disease" and gout are new. (Doc. 164, Motion at 4-5 (citing the presentence report).) *See United States v. Gileno*, No. 3:19-cr-161, 2020 WL 1307108, at *2-4 (D. Conn. Mar. 19, 2020) (denying motion for release because defendant failed to satisfy exhaustion requirement and also because his medical conditions were "largely the same as when he was sentenced" and he had not "shown that the plan proposed by the Bureau of Prisons is inadequate to manage the pandemic within [his] correctional facility, or that the facility is specifically unable to adequately treat" his preexisting medical conditions).

The United States acknowledges that Bolze is 71 years old and that individuals over 65 face a higher risk of complications from COVID-19. *See* Groups at Risk for Severe Illness, Centers for Disease Control, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-

extra-precautions/groups-at-higher-risk.html (accessed Apr. 29, 2020). But age is not a "serious physical or medical condition . . . that substantially diminishes [Bolze's] ability to provide self-care within the environment of a correctional facility." U.S.S.G. 1B1.13, cmt. n.1(A). And the other medical conditions listed by Bolze are either being treated by medication (*see* Doc. 164, Exhibit D) or have not been recognized by the CDC as creating a higher risk of complications from COVID-19. For example, the CDC has recognized chronic kidney disease *that requires dialysis treatment* as a condition which creates a higher risk of complications from COVID-19, but Bolze has not even alleged that his kidney disease is that severe. Even if this Court were to find that the combination of Bolze's medical conditions and risk of contracting COVID-19 fit within one of the categories listed in U.S.S.G. § 1B1.13, the Court must also find that his condition rises to the level of severity required by that policy statement. *See, e.g.*, *United States v. Gamble*, No. 3:18-cr-22-4, 2020 WL 1955338, at *4 (D. Conn. Apr. 23, 2020) (denying motion from diabetic defendant because his condition was well-controlled by medication, BOP had implemented appropriate measures to protect him against COVID-19, and defendant had "not persuaded the Court that he is any worse off than the public at large" with respect to COVID-19); *United States v. Shah*, No. 16-20457, 2020 WL 1934930, at *2 (E.D. Mich. Apr. 22, 2020) (denying motion from defendant with diabetes and hypertension because, in part, those "medical conditions are not out of the ordinary, nor . . . fatal or untreatable," and there were no confirmed cases of COVID-19 in his facility). So if the Court were to even consider the substance of Bolze's motion, it should conclude that Bolze has not established any "extraordinary and compelling reason" for a sentence reduction within the meaning of U.S.S.G. § 1B1.13.

16

B.   Allegations that Bolze's current sentence would not have been imposed had he been sentenced today, due to intervening legal changes, do not amount to extraordinary and compelling reasons warranting his immediate release.

In addition to his medical condition and concerns about COVID-19, Bolze alleges that immediate release is justify because of his rehabilitative efforts and because he would likely have received a lesser sentence if sentenced for the first time today, due to a Guidelines amendment. (Doc. 164, Motion at 3, 6-7.)  In other words, he seeks the retroactive application of a Guidelines amendment which the Sentencing Commission declined to make retroactive.  Yet "the disparity between [Bolze's] actual sentence and the one he would receive if he committed his crimes today is not an 'extraordinary and compelling circumstance.'"  *United States v. Neubert*, No. 1:07-CR-166, 2020 WL 1285624, at *3 (S.D. Ind. Mar. 17, 2020); *accord United States v. Nasirun*, No. 8:99-CR-367-T-27TBM, 2020 WL 686030, at *2 (M.D. Fla. Feb. 11, 2020).  Neither the policy statement in U.S.S.G. § 1B1.3 nor BOP's regulation provide any basis for compassionate release based on a reevaluation of the severity of the original sentence.  *See* Bureau of Prisons Program Statement 5050.50, *available at* https://www.bop.gov/policy/progstat/5050_050_EN.pdf (accessed Apr. 29, 2020).  Nor are rehabilitative efforts ever extraordinary within the meaning of § 1B1.13.  Bolze's assertions that his existing sentence is too extreme and that he is sufficiently rehabilitated do not constitute extraordinary and compelling reasons to justify his release.

According to Bolze, the Court may grant compassionate release for reasons other than the categories listed in U.S.S.G. § 1B1.13 (Doc. 164, Motion at 2-3), but that argument rests upon a "faulty premise that the First Step Act somehow rendered the Sentencing Commission's policy statement an inappropriate expression of policy."  *United States v. Willingham*, 2019 WL 6733028, at *2 (S.D. Ga. Dec. 10, 2019) (further explaining that such an interpretation "contravenes express Congressional intent that the Sentencing Commission, not the judiciary,

determine what constitutes an appropriate use of the 'compassionate release' provision.").

By enacting the First Step Act, "Congress in fact only expanded access to the courts; it did not change the standard." *United States v. Ebbers*, 2020 WL 91399, *4 (S.D.N.Y. Jan. 8, 2020).

Admittedly, some courts have assumed that they may define for themselves the circumstances that permit compassionate release, unfettered by the Commission's policy statement, but many courts concur with the United States that the policy statement remains controlling. *E.g.*, *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *3 (10th Cir. Mar. 26, 2020) ("neither the § 1B1.13 commentary nor BOP Program Statement 5050.50 identify post-sentencing developments in case law as an 'extraordinary and compelling reason' warranting a sentence reduction"); *United States v. Pitts*, 2020 WL 1676365, at *7 (W.D. Va. Apr. 6, 2020) (refusing to commit an inappropriate "end run" around a statutory provision that is not retroactive); *United States v. York*, 2019 WL 3241166, at *4 (E.D. Tenn. July 18, 2019) (finding "no reason to believe that the identity of the movant (either the defendant or the BOP) should have any impact on the factors the Court should consider"). This Court should reject Bolze's invitation to grant compassionate release on any basis not authorized by § 1B1.13.

    C.    <u>Even if Bolze had established extraordinary and compelling reasons for release, the § 3553(a) factors weigh against such relief.</u>

Finally, even if Bolze had established an extraordinary and compelling reason for release, this Court would then need to consider the 18 U.S.C. § 3553(a) factors, to the extent applicable, to determine whether release is warranted. When originally sentencing Bolze, the Court found that those factors justified a custodial sentence in excess of 27 years, even though Bolze was already 61 years old. In short, Bolze had "perpetrated fraud for more than six years, devastated more than 100 victims, and misappropriated millions of dollars." *Bolze*, 444 F. App'x at 893. To date, Bolze has served approximately 40 percent of his sentence. Granting immediate release

now—when Bolze has served less than half of his sentence—would be inconsistent with the

§ 3553(a) factors, which require this Court to consider not only a defendant's characteristics,

including his age and medical condition, but also "the nature and circumstances of the offense,"

§ 3553(a)(1); "the need for the sentence imposed to reflect the seriousness of the offense . . .

and to provide just punishment," § 3553(a)(2)(A); "the sentencing range established" by the

Guidelines, § 3553(a)(4); and "the need to avoid unwarranted sentence disparities among

defendants with similar records who have been found guilty of similar conduct," § 3553(a)(6).

The severity of Bolze's offense warrants a severe sentence.

## III.    The Court cannot place Bolze on home confinement or order BOP to do so.

By invoking the Coronavirus Aid, Relief, and Economic Security (CARES) Act, Pub. L.

No. 116-136, 134 Stat. 281 (Mar. 27, 2020), Bolze may be asking this Court, in the alternative, to

allow him to complete his sentence on home confinement.  (Doc. 164, Motion at 3-4 (citing the

CARES Act and discussing BOP policies to determine eligibility for home confinement); *see

also* Doc. 165, Motion at 1, 4 (again discussing BOP criteria for placing inmates on home

confinement); Doc. 166, Motion at 2-3 (same).)  But the CARES Act does not authorize this

Court to modify his sentence or the location where he serves it; rather, it temporarily permits the

Director of the Bureau of Prisons to "lengthen the maximum amount of time" for which home

confinement may be granted.  CARES Act, § 12003(b)(2), 134 Stat. at 516.

Although a court may make recommendations about where a sentence should be served,

its recommendations have "no binding effect" on the Bureau of Prisons, which has exclusive

authority, "not reviewable by any court," to "designate the place of [a] prisoner's imprisonment."

18 U.S.C. § 3621(b); *accord Tapia v. United States*, 131 S. Ct. 2382, 2390-91 (2011).  To be sure,

Congress has authorized *the Bureau of Prisons* to "place prisoners with lower risk levels and

lower needs on home confinement," but it gave no such authority to district courts.[4] 18 U.S.C.

§ 3624(c)(2). Bolze identifies no statutory authority under which this Court could order him to

complete his sentence on home confinement.[5]

## Conclusion

For the foregoing reasons, the Court should deny Bolze's motion because Bolze has

failed to exhaust his administrative remedies and has failed to establish any entitlement to relief.

Respectfully submitted,

J. Douglas Overbey
United States Attorney

By:      *s/ Francis M. Hamilton, III*
Francis M. Hamilton, III
Assistant United States Attorney
TN BPR# 019096
U.S. Attorney's Office
800 Market Street, Suite 211
Knoxville, TN 37902
(865) 545-4167
Trey.Hamilton@usdoj.gov

---

[4] As discussed above, BOP is already evaluating all its inmates—including Bolze—to decide which of those inmates should be released to home confinement in light of COVID-19.

[5] If the Court were to grant a sentence reduction, however, it has authority to "impose a term of . . . supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment." 18 U.S.C. § 3582(c)(1)(A). And doing so, the Court may impose a period of home confinement as a condition of supervised release, provided that the Court finds that home confinement is a "substitute for imprisonment." U.S.S.G. § 5F1.2; *see* 18 U.S.C. § 3583(d). Alternatively, a court may consider modifying an existing term of supervised release to add a period of home confinement, consistent with U.S.S.G. § 5F1.2. *See* 18 U.S.C. § 3583(e)(2).

## CERTIFICATE OF SERVICE

I certify that on April 29, 2020, this response was filed electronically and a true copy was

sent to defendant by regular United States mail, postage prepaid, addressed as follows:

Dennis R. Bolze
No. 14825-067
FCI Coleman Low
P.O. Box 1031
Coleman, FL  33521

                     *s/ Francis M. Hamilton, III*
                     Francis M. Hamilton, III
                     Assistant United States Attorney